JABEZ C. HOWE AND OTHERS vs. CHARLES KEELER.

The plaintiffs had loaned a manufacturing corporation $45,000, and had entered into a contract with the corporation, by which they were to make further advances if necessary, and the corporation was to stock and run its mills to their full capacity, and consign the goods manufactured to them as its agents, they to be allowed commissions on such sales and to apply a certain portion of the proceeds of the sales to the payment of their advances until they were fully paid; the plaintiffs also to have the right, at its option, on a breach of the agreement by the corporation, to take possession of the factory, machinery, stock and goods, and run the factory at the risk and on account of the corporation till they were paid; the plaintiffs at the same time taking a mortgage of the real estate and machinery which gave them the same power. They afterwards exercised this power, and took the control of the property, the directors of the corporation voting to give up the possession to them, and appointing an agent to make delivery of possession, who on the same day delivered to them the keys of the factory. The plaintiffs then proceeded to run the mills, under the provisions of the contract, carrying on the same business and with the same workmen, employing the same bookkeeper, though with a change of books—the former agent of the corporation being frequently at the office, but exercising no control over the business. The defendant, an officer, a few days after, attached the machinery and a quantity of cloths in the factory, on a writ in favor of a creditor of the corporation, and the plaintiffs brought an action of trespass against him therefor. Held, on the above facts, found by the court on the trial of the case.—1. That the plaintiffs were not to be regarded as having possession and running the mills as the mere agents of the corporation, although running them at the risk and on account of the corporation, since they had an interest in the property and in the proceeds of the business as security for their advances, and the property could not be taken from them by the corporation except upon the terms provided by the contract. 2. That the question whether there had been, as to the personal property, a retention of possession by the corporation that rendered the transfer of the same fraudulent as against creditors, was one of fact, and the court could not, as a matter of law, infer such retention of possession from the facts found.

Held also, that although the plaintiffs were only special owners of the property, having an interest that was liable to be divested whenever their advances should be paid, yet it was not incumbent on them, in the above action, to assume the burden of showing that their interest had not been thus extinguished, but such interest would be presumed to continue in the absence of evidence offered by the defendant to the contrary.

The statute that requires that where a deed is executed by an agent, his authority shall be evidenced by a written power executed with the formalities of a deed, has no application to deeds executed in behalf of a corporation by its agent.

As the question with regard to the authority of an agent in such a case is merely whether he had lawful authority to affix the corporate seal, there would seem to be no good reason why a deed already executed by a

Howe *v.* Keeler.

person acting as agent of a corporation, may not be made valid by a subsequent ratification of his act.

A ratification of the act of an agent of a corporation in making a contract in its behalf, may be implied by the acts of the corporation, as well as expressed by its vote.

It is not necessary that machinery in a factory should be particularly described in a mortgage, where it is mortgaged with the factory and possession delivered to the mortgagee.

TRESPASS, to recover for certain machinery and cloths attached by the defendant as a deputy sheriff, as the property of the Bridgeport Woolen Mills, a corporation, in a suit brought by one Henry Hoag against the corporation. The plaintiffs, who were partners under the name of J. C. Howe & Company, claimed the property under a contract with the corporation dated April 12, 1855, and a mortgage of the same date; under the provisions of which contract and mortgage, they claimed to have taken possession of the property on the 11th day of November, 1856, and to have been in legal possession of the same at the time the property was attached by the defendant, which was on the 22d day of November, 1856.

The material parts of the contract are as follows:—
" Whereas said corporation has borrowed of said J. C. Howe & Co. the sum of $45,000, to enable it to purchase certain real estate, water power and mills, and all their contents, consisting of machinery, steam engines, manufactured goods, warps, yarns, stock and other general supplies for manufacturing purposes, situate in Bridgeport and lately owned by Thatcher T. Payne, for the purpose of continuing at said mills a manufacturing business; and has given said J. C. Howe & Co. its promissory note of even date herewith for said sum of $45,000, payable at the Suffolk Bank in two years from date, with interest payable semi-annually; and as a further inducement for said loan has agreed to constitute said J. C. Howe & Co. their selling agents, and to consign to them all goods now owned or hereafter manufactured at said mills by said corporation, on which said J. C. Howe & Co. are to make advances as hereinafter set forth; and

has further agreed to secure the payment of said note and said advances, and all future indebtedness to said firm, under this agreement or otherwise, by a mortgage of all the real and personal estate of said corporation:—Now said corporation doth hereby promise and agree with said J. C. Howe & Co., that it will further stock and run its said mills within sixty days from the date hereof, and will keep the same so stocked and running to their full and fair capacity, unavoidable casualties excepted, during the continuance of this agreement, and until said loan is paid in full; and will consign to them all goods now in the hands of said corporation, and all goods hereafter to be manufactured at its said mills, and will furnish them with weekly statements of the products of said mills, and duplicate invoices of all goods sent. All the goods so produced or consigned, are to be sold by said J. C. Howe & Co., at such rates, in such places, on such terms, and to such persons, as they, in the exercise of a sound discretion, shall think most for the benefit of said corporation; and all such sales are to be guaranteed by said J. C. Howe & Co.; and they are to charge thereon the usual commission of six per cent. for selling and guaranteeing sales, and three-eighths of one per cent. for fire insurance, and also their customary store charges (not exceeding, however, one per cent.) for storage, truckage, porterage, advertising, postages, &c., all which charges on all goods sold as aforesaid, said corporation agree to allow as cash. And said J. C. Howe & Co. agree to make advances on all such consignments of goods, by accepting the drafts of said corporation, on six months, to be drawn after the receipt of such goods, to the amount of three-quarters of the market value of the goods so consigned and received. And said firm further agree to forward to said corporation weekly statements of sales, and at the expiration of every month said corporation may draw drafts at six months, which said firm will accept, to the amount of one-half of the net proceeds of the previous monthly sales, after deducting all advances, interest and other agreed charges thereon, and the other half of such net proceeds is to be retained by said firm to constitute a sinking

fund toward the payment of the principal of the $45,000
loaned as aforesaid, the amount of such sinking fund to be
ascertained and applied semi-annually on the making up of
stock accounts and accounts current on the last day of each
June and December during the continuance of this agree-
ment. It is further agreed that said corporation may at any
time terminate this contract by giving said firm sixty days
notice in writing of their desire so to do, and by paying up
to said firm all debts due to them from said corporation under
this agreement, whether then due or subsequently maturing;
but until such notice is given, and said sixty days have
expired, and all such debts and demands are fully paid and
satisfied, said corporation shall run its said mills, and manu-
facture, unavoidable casualties excepted, to the full and fair
capacity of said mills, all such goods as said firm, in the
exercise of a sound discretion, may deem most advantageous
to said corporation; And if said corporation shall fail to run
said mills as aforesaid, or omit to pay and satisfy the debts
and demands due to said firm under this agreement, or shall
make or suffer any other breach of any of its promises or
agreements herein contained, then, if said firm so elect, said
firm may immediately and without notice enter and take
possession of said mills, and all machinery, goods, stock,
supplies and fixtures therein, and all the water power, build-
ings, lands, and all their appurtenances, privileges or things
acquired by the original purchase of said corporation; and
said firm may also stock and run said mills for account and
risk of said corporation, charging said corporation for all
stock and supplies which said firm may send to said mills,
and for all costs of repairs, outlays and expenses of every
kind necessary and proper, in the opinion of said firm, for
the care and management of said property, and the manufac-
turing and preparing goods for market; and said firm are to
have entire control and management of the making and sell-
ing for the account of said corporation all such goods as said
firm may think judicious; and on all sales of all such goods
may charge a commission of two and a half per cent. in
addition to the commissions hereinbefore reserved, as com-

pensation for furnishing stock and supplies; or said firm may, at their option, instead of supplying and running said mills as aforesaid, assume that the product of said mills would be at the rate of $20,000 per month, and they may charge a commission of three per cent. on such assumed product so long as said stoppage continues, unless the same occurs from inevitable accident or necessary repairs ; or said firm may, if they so elect, sell said mills, and all the machinery and other fixtures therein, and all the buildings, lands, water power, and improvements, constituting the manufacturing establishment of said corporation, and all the right, title, interest, and estate of said corporation in the same at the date hereof, and all subsequently acquired, at public auction, and all the equity of redeeming the same from under the mortgage of said corporation to said firm, or sell any part or portion of the premises aforesaid. And it is expressly agreed that said firm may put in force either or all (so far as th ey are compatible) of the remedies herein provided for said firm's security, in case of a breach of this contract by said corporation, and especially that, after running said mills or charging the commission of three per cent. on the aforesaid assumed monthly product thereof as aforesaid, they may afterwards, if the breach of the agreement continues, exercise the power of sale herein provided to its full extent ; said remedies being intended to be concurrent as well as diverse, and the exercise of any or all said remedies (so far as they are compatible) is not to exclude said firm from pursuing any other remedy which by the laws of Connecticut, to recover their rights, they may be entitled to.

"As security for the payment of said note of $45,000, and the due performance by said corporation of its promises and agreements herein contained, said corporation have executed and delivered to said firm a transfer of its one-half interest in the Berkshire Milling Company, and also a mortgage, of even date and delivery herewith, of said woolen mills, machinery, water power, lands and buildings and their appurtenances, conditioned for the payment of said note and interest, and the due performance of said promises and agree-

ments, and re-payment to said firm of all debts due from said corporation, with the power of foreclosure and sale, unobstructed by said corporation or their assignees, in case of breach, as hereinbefore set forth ; which mortgage is hereby referred to and to be taken as part of this agreement. * * * And it is expressly agreed that if there. be a breach of any of the covenants or conditions of said mortgage or of this agreement, especially in the payment of said note or of the interest thereon, then said firm may forthwith enter on the mortgaged premises, and exercise all their rights, powers and authority, and prosecute all their remedies, as herein set forth, unobstructed in any manner by said corporation, as effectually and fully as if this contract was incorporated into said mortgage and made a part thereof; or they may pursue any other remedy under said mortgage which by law they would be entitled to, without being obliged to exercise the power of sale reserved in said mortgage. And said corporation further agree to provide said firm with a copy of their by-laws duly certified, and of their articles of association signed by all the stockholders, and also to pay all legal expenses of examining titles, drafting and recording papers, and of opinions, services and advice of competent counsel thereon, and other legal expenses incident to carrying this agreement into effect and of maintaining and enforcing the same. And if changes or additions are hereafter made to the machinery in said mills, and new mortgages are deemed necessary to give said firm full security on all machinery and fixtures in said mills, then said corporation agree, on request, to give new mortgages, including such new or additional machinery or fixtures. * * * * * *

Dated this 12th day of April, 1855.

                BRIDGEPORT WOOLEN MILLS,
                   by their agent and president,
                        H. W. CHATFIELD.
                        J. C. HOWE & Co."

The mortgage, which was of the same date, conveyed to the plaintiffs all the real estate belonging to the corporation, with all the machinery in the mills, the latter being no oth-

erwise described in the mortgage than as follows : "including all the machinery of every description in said mills, steam engines and all their appurtenances." The condition of the deed was. as follows :

" Whereas the Bridgeport Woolen Mills aforesaid, are indebted to said firm of J. C. Howe & Co., in the sum of $45,000, by note, dated April 12th, 1855, payable two years from date, with interest payable semi-annually, at the Suffolk Bank in Boston:   And whereas the said Bridgeport Woolen Mills have entered into and have made and have executed ·a contract with said J. C. Howe & Co., dated April 12, 1855, which said contract is hereby referred to and made part of the indebtedness, covenants and agreements secured by this mortgage: Now if said Bridgeport Woolen Mills shall well and truly pay, or cause to be paid, to said J. C. Howe & Co., said note and interest according to its tenor and effect; and shall also keep and perform all their promises and agreements contained in the above mentioned contract; and shall also pay to said firm all sums of money, debts, notes and liabilities now or hereafter due, payable or incurred by said corporation to said firm, or assumed by said firm for the account of said corporation, at the request of said corporation in writing; and until such payments and full performance of said promises and agreements, shall keep the granted premises insured against fire, and deposit policies with said firm, in a sum not less than $47,000, payable in case of loss to said mortgagees, at such insurance offices as they shall approve, or in default therefore shall pay, on demand, to said mortgagees such sums as they, the said mortgagees, shall reasonably pay for such insurance, with interest; and shall also pay all taxes assessed or levied on said premises ;—then this deed shall be void, otherwise not, but fully effective in law.   But in default of the promises or covenants contained in said agreement, then said grantees may enter and take possession of said premises, as in said contract is fully agreed and specified."

The deed was executed in the name of the Bridgeport Woolen Mills by H. W. Chatfield, agent and president—and

was acknowledged by him before a magistrate on the 30th day of April, 1855.

The plaintiffs, for the purpose of proving the authority of Mr. Chatfield to execute the contract and mortgage, offered in evidence a vote of the directors of the corporation, passed on the 25th day of April, 1855, which was as follows : " Voted that the president of the company be authorized to sign a mortgage deed to J. C. Howe & Co., and affix the seal of the corporation thereto." Also a vote of the directors passed on the 5th day of May, 1855, which was as follows : " Voted that the mortgage deed, made by the agent appointed by this company on the 25th day of April, 1855, wherein a conveyance is made to J. C. Howe & Co. of the real estate, mills and machinery belonging to this company, is hereby ratified and fully approved." They also offered evidence of the election of Mr. Chatfield by the directors as president of the corporation, at a meeting holden on the 4th day of April, 1855. The defendant claimed that the directors who passed these votes and elected the president, had not been legally elected, but the court found that they had acted as directors from the time when it was claimed that they were elected, (April 4, 1855,) to the 11th day of November, 1856. The defendant also claimed that the votes in question, if regularly passed, did not authorize the execution of the contract and mortgage, and that the mortgage was void as to an attaching creditor, so far as the machinery was concerned, because the machinery was not particularly described.

The plaintiffs claimed to have taken lawful possession of the property under the contract and mortgage on the 11th day of November, 1856, and in proof of this offered in evidence the following votes of the directors, passed on that day, viz. :

" Voted, That Courtland Kelsey be and is hereby appointed the agent of this company, to give J. C. Howe & Co. possession of the mills, appurtenances, stock and all other property mortgaged by us to said J. C. Howe & Co., by

deed, dated April 12, 1855, we finding it impossible to fulfill the stipulations therein contained.

" Voted, that said J. C. Howe & Co. are hereby authorized to receive said property, and to run said mills and carry on the business, or let or lease the mills and appurtenances to others, and to generally do and perform every and all things which they may deem for the benefit of said property and of said Woolen Mills ; and all payments made hereafter by said J. C. Howe & Co., for past or future labor, or other indebtedness heretofore contracted by said Woolen Mills, shall not be disputed by us, but said J. C. Howe & Co. are hereby fully authorized and empowered to pay any such labor and any past indebtedness which they may deem best, from the proceeds of any property placed in their possession by said Woolen Mills, and all such payments shall be and are hereby sanctioned and allowed. And any of the present directors of the Bridgeport Woolen Mills, or their authorized agent, shall at all times have reasonable access to the books of said mills for examination when requested, and said directors shall be entitled to an account current semi-annually if desired."

They also offered in evidence an entry made by themselves at the same time upon the records of the corporation, under the above votes, as follows : " Bridgeport, Nov. 11, 1856. We, J. C. Howe & Co., do take possession of the Bridgeport Woolen Mills under the vote above recorded, and in accordance with its provisions.     J. C. HOWE & Co."

To the admission of the foregoing votes of the directors the defendant objected, because it appeared by the record that one of the directors was absent from the meeting at which they were passed, and because there was no evidence that the absent director had been notified of the meeting. The court however admitted them, in connection with the other evidence.

In connection with the votes of November 11, 1856, the plaintiffs proved that afterwards, on the same day, the said Kelsey, in behalf of the corporation, delivered the keys of the factory to the plaintiffs on the premises, and that the plain-

tiffs thereupon took into their own hands the control of the establishment, and the machinery and goods therein, including the articles in question, under the clause of the contract of April 12, 1855, authorizing them to enter and take possession on certain contingencies therein mentioned, for the purpose of carrying on the business thereafter under the provisions of the contract in relation to that subject; and that they thereupon opened a new set of books, appointing, however, the book keeper of the corporation to be their own book keeper, and carried on the business of the factory under the provisions of the contract, disbursing their own money in paying workmen and in other expenses, and charging their disbursements agreeably to the contract. The same kind of business was carried on at the factory, and by the same workmen, as before the change, and the new books were left in the same office where the books of the corporation had been kept, and where they continued to remain; but the agent of the corporation ceased to exercise any control at the factory or at the office, although he continued, as before, to be occasionally at the office. The defendant, for the purpose of showing the character of the plaintiffs' possession of the mills, machinery and goods, read in evidence a letter from them to the president of the corporation, dated the 25th of August, 1857, and a vote of the directors, passed on the 10th day of September, 1857, claiming that they showed that the plaintiffs were in possession of the mills and running them only as agents of the corporation. The letter was as follows:

" *H. W. Chatfield, Esq., President Bridgeport Woolen Mills*—Dear Sir :—We have had several conversations with Mr. Green in regard to your mills, and have expressed our belief that, with the present high prices of stock and the dull market for the sale of woolen manufactured goods, the mills could not be made to make money, but on the contrary our belief is they are losing money, and we requested him to bring up the subject before the directors, and consider whether it would not be best to run out the stock and stop the mills. It goes against the grain with us to continue to run the mills for you at a loss. We wish to do what the directors

think best, but we consider it our duty to express our opinion
and views upon the subject.   Stock is very high and advanc-
ing, and goods are dull of sale and not paying cost in our
opinion.   *   *   *   We wish you would call a meeting of
your directors and take immediate action upon the subject,
and let us know the result of your deliberations, and oblige,
yours truly, J. C. Howe & Co."   The vote referred to was as
follows :   " *Resolved,* That we deem it for the best interest
of all concerned, that J. C. Howe & Co. be notified to discon-
tinue running our mills after running out the stock now on
hand, unless, before this shall be effected, there shall be such
a change in the price of stock and made goods that they
shall deem it best to 1e-stock and continue running the mills;
and that the president be requested to communicate this
resolution to J. C. Howe & Co."

No evidence was introduced of the state of the accounts
between the plaintiffs and the corporation, nor was any evi-
dence introduced by the plaintiffs of the indebtedness of the
corporation to them except as before stated, and excepting
that it appeared incidentally that the contract of April 12, 1855,
was acted upon by the parties, and the business carried on
under it, and that on the 11th day of November, 1856, a
large amount of cloths of the corporation, of the value of
about $75,000, was in the hands of the plaintiffs remaining
then unsold on account of the dullness of the market.   The
defendant admitted that he took and removed the cloths
mentioned in the plaintiffs' declaration, and had since dis-
posed of the same under an order from a County Commis-
sioner, and claimed that the goods were lawfully taken and
disposed of by him, by virtue of the writ of attachment
before mentioned, the proceedings under which were agreed
to be regular.   It was also agreed that the machinery, which
had also been attached by the defendant by virtue of the same
process, had not been removed by him, but was left and still
remained in the factory, and both parties being desirous of
trying the question of right in relation thereto, it was agreed
that if, in the opinion of the court, the plaintiffs were entitled
to recover for the same, nominal damages should be assessed

on account of the machinery. Prior to the attachment of the property by the defendant, the taking of the same was forbidden by the plaintiffs' book keeper, who stated to the defendant that the property had been transferred to the plaintiffs.

Upon the foregoing facts the question was reserved for the advice of this court, whether the plaintiffs were entitled to recover; and if entitled to recover for the cloths, the court found the value thereof at the time of the attachment to have been $1,900, and if for the attachment of the machinery, the court assessed the damages therefor at one dollar.

*Dutton* and *Loomis*, for the plaintiffs.

1. The contract of April 12, 1855, under which the plaintiffs claim a title to the property, was legally executed as the contract of the corporation. Chatfield was the legal president of the corporation at the time, and if he was not, yet he was such *de facto*, which is sufficient for the present purpose. The mortgage of the same date refers to and confirms this contract, and this mortgage, as appears by the acknowledgment, was not executed and delivered until the 30th day of April, which was after the vote of the directors of the 25th of April; and this mortgage was further confirmed by the vote of the directors on the 5th of May, there being no question as to the legality of the meeting of the directors at that time. A subsequent vote of a corporation or its directors can ratify and validate the execution of a deed in the name of the corporation by a person acting as agent of the corporation, but not having sufficient prior authority. It is not necessary that the authority given by a corporation to an agent to execute a deed in its behalf should be in writing, as in the case of individuals, and therefore the act of the agent can be ratified in the same manner as any other act of an agent. And in this case the execution of both contract and mortgage have been ratified, and the rights of the plaintiffs under them confirmed, by the acts of the corporation, in giving the plaintiffs possession of the mills under the contract, and in allowing them to run them. A corpora-

tion can confirm such rights by implication as well as by express declaration. *Bank of Columbia* v. *Patterson*, 7 Cranch., 305. *Proprietors of Canal Bridge* v. *Gorton*, 1 Pick., 297. *Episcopal Charitable Society* v. *Episcopal Church in Dedham*, id., 373. *Mott* v. *Hicks* 1 Cow., 532. A. & A. on Corp., §§ 239, 240.

2. The contract being assumed then to be a valid one, what were the rights of the plaintiffs under it, and what was their interest in the property after they had taken possession of it? It is claimed that, as they were to run the mills at the risk and on account of the corporation, they were acting merely as agents of the corporation. But it is very clear that the object of the whole contract and mortgage, was to enable the plaintiffs to avail themselves of the property as security for their advances. If they were in any proper sense agents of the corporation, yet they were agents with an interest, and therefore were not mere agents. And that interest was such that the corporation could not have taken the property out of their hands, or have put an end to the agency, except by paying them their claim. They could not be called agents in any proper sense.

3. The delivery of possession was sufficient. The delivery was actual, extending to the entire control of the property. As the plaintiffs were to go on with the same business, they would of course employ the same workmen, and the change of possession was necessarily less calculated to attract observation than in most cases of the change of possession of property. But the plaintiffs did all that could well have been done in taking possession. It certainly can not be inferred from the facts found that there was a fraudulent retention of possession by the mortgagors.

4. As it is found that the plaintiffs had originally a good lien, it will be presumed that it continues, in the absence of any evidence that it has become extinguished. It was not incumbent on the plaintiffs, therefore, to show, in the first instance, that their debt was not paid, nor how much of it remained unpaid. Such an investigation of the accounts between the plaintiffs and the corporation, in an action of

trespass, and in a case too where the corporation was not a party, would be almost impracticable.   At any rate, if it was the duty of the plaintiffs to have shown the state of the account, the court will send the case back for a further hearing upon this point.

*Hawley* and *Beardsley,* for the defendant.

1. The plaintiffs acquired no property in the goods attached by the defendant, by reason of the contract of April 12, 1855, or the vote of April 25th.   Neither purports to give them any such property.   And after the plaintiffs took possession of the mills on the 11th of November, 1856, their relation to the property was essentially the same as before. They were mere agents of the corporation.   They were running the mills at the risk of the corporation and on their account.   They were charging the corporation not only for all their disbursements, but for their own services and for commissions on sales.   The letter of the plaintiffs of August 25, 1857, clearly shows that they did not regard themselves as having any property in the goods.

2. But if they acquired any property under the contract, they did not take such possession as the law required to make their title good against attaching creditors.   A mere symbolical delivery of possession is not enough.   The change of possession must be actual and open.   Especially was there no such change of possession as the law will regard, if the plaintiffs were acting as the agents of the corporation, as in that case their possession would be that of the corporation.   *Peck* v. *Whiting,* 21 Conn., 206.   *Sanford* v. *Lyon,* id., 604.

3. The contract was not the contract of the corporation, because Chatfield, who executed it, had no authority from the corporation.   We admit that he was president *de facto,* but as president he had no power.   Special authority was necessary.   There is no vote giving him authority to sign the contract.   The vote afterwards given authorizes him to sign the mortgage only.   It is said however that his act has been ratified by the vote of the directors of November 11th, 1856,

giving to the plaintiffs possession under the contract. But the meeting of the directors at which this vote was passed was not a legal one, inasmuch as all the directors were not present, and it does not appear that all were notified. This vote therefore, as either a ratification of the execution of the contract, or as giving legal possession of the property to the plaintiffs, is of no effect, and is not to be regarded as the act of the corporation. *Stowe* v. *Wyse,* 7 Conn., 214, 219. *Savings Bank* v. *Davis,* 8 id., 191. *Rex* v. *Langhorne,* 4 A. & E., 538. *King* v. *Faversham,* 8 T. R., 356. *Waterbury* v. *Clark,* 4 Day, 198. A. & A. on Corp., §§ 488, 489.

4. The mortgage deed is void. No legal authority was given to Chatfield to execute it. The only authority claimed is by the vote of April 25, 1855. But, besides the objection to the legality of this meeting, the mortgage, by its date, appears to have been executed thirteen days before. So far as the vote of the directors of the 5th day of May is regarded as affecting the transaction, it was clearly after the execution, and therefore can operate, not by giving authority to Chatfield, but by ratifying his act. But the execution of such a deed can not be ratified by a subsequent vote of the corporation, so as to make it a valid deed. It is essential to the validity of the deed that it be the deed of the corporation. But such ratification does not make it the deed of the corporation. Further, the directors of a joint stock company have not power to mortgage the property of the corporation. This can be done only by vote of the stockholders. In *Savings Bank* v. *Davis,* (supra,) it was held that the directors had power to mortgage because the charter gave them power to *dispose* of the property. No such power is given by the statute with regard to joint stock corporations, but only the power to *manage* the property and affairs of the corporation. Rev. Stat., tit. 3, sec. 200.

5. If the plaintiffs have a valid title, yet as it is limited to their special interest, the corporation remaining general owners, they can recover only to the amount of that special interest, and it is for them to show this amount. Their debt may have been paid, or so far reduced that they ought not to

recover of us the full value of the property taken. On this subject they offered no evidence whatever. They ought not therefore to recover. 1 Pars. on Cont., 600.

SANFORD, J. The due organization of the Bridgeport Woolen Mills, and the election of a board of directors for the management of its concerns on the 4th of April, 1855, were admitted in the argument. And the superior court has found that the persons who appear by the records of the corporation to have been chosen directors, acted as such, and as such carried on the business of the corporation, up to the 11th of November, 1856, and that, on that day, Kelsey, acting in behalf of the corporation, and, as the plaintiffs claimed, under a vote of its directors, delivered the keys of the factory to the plaintiffs on the premises, and the plaintiffs thereupon took into their own hands the control of the manufacturing establishment, and the machinery and goods therein, including the articles in question, under a contract which the plaintiffs claimed had been made between them and the corporation, dated the 12th of April, 1855, and which authorized the plaintiffs to take possession, on certain contingencies therein mentioned, for the purpose of carrying on the business thereafter, under said contract and according to the provisions thereof.

The defendant claimed that no authority was shown for the execution of the contract referred to, and also claimed that said Kelsey had no authority to surrender the property to the plaintiffs, because, from the meeting at which he was appointed agent for that purpose, one of the directors was absent, and no evidence was offered to show that that director was notified to attend said meeting.

The finding of the superior court however shows, that a mortgage was made to the plaintiffs of all the property of the corporation, bearing the same date as the contract, and executed on behalf of the corporation by the president thereof, and that said contract and mortgage reciprocally count upon and recognize the making of each other, and purport to form parts of one and the same transaction, and

that, at a meeting of the directors of the corporation, on the 25th of April, 1855, a vote was passed, which in terms authorized the president to sign and affix the seal of said corporation to said mortgage ; and from the magistrate's certificate the mortgage appears to have been acknowledged after the vote of the 25th of April was passed, to wit, on the 30th of the same month.

It may therefore fairly be presumed, that neither the contract nor the mortgage, though both bearing date the 12th of April, was in fact delivered until after the acknowledgment of the mortgage on the 30th. And on the 5th of the succeeding month of May, at a meeting of the directors of the corporation, it was " voted, that the mortgage deeds made by the agent appointed by this company on the 25th of April, 1855, wherein a conveyance is made to J. C. Howe & Co. of the real estate, mills and machinery belonging to this company, is hereby ratified and fully approved." No objection is made to the organization of the last mentioned meeting of directors, and it is of little importance whether the meeting of the 25th of April was duly convened, or the vote of that date sufficiently specific in its reference to the instrument to be executed or not, because the vote last referred to, as well as the subsequent conduct of the parties, operated to confirm and ratify the mortgage, and, by consequence, the contract also, to which the condition of the mortgage expressly refers, and to secure the performance of which the mortgage was made.

Upon the question whether the vote of confirmation was effectual for the purpose for which it was passed or not, we were referred to no authorities. And we only say in regard to it, that it is by no means clear that this case does not fall within the operation of the rule, that a subsequent assent to, and approbation of, an act done, is equivalent to a prior authority to do it. The authority of an agent to convey the real estate of an individual must, by the express provisions of the statute, be evidenced by a written power executed with all the solemnities of a deed from the grantor himself. But this statute is inapplicable to a conveyance from a corpora-

tion aggregate. *Savings Bank of N. Haven* v. *Davis*, 8 Conn., 191.   And, it being a mere question of authority in the agent to affix the seal, it is not easy to see why the consequences of the act done, might not, in this as in other cases, be assumed, in the same manner as the authority to do the act might have been originally conferred.

But, however this may be, it is found by the court below that " it incidentally appeared, that said contract of April 12th, 1855, was acted upon by the parties, and the business of the Woolen Mills carried on under it, and that on the 11th day of November, 1856, a large amount of the cloths of the said Bridgeport Woolen Mills, of the value of about seventy-five thousand dollars, was in the hands of the plaintiffs unsold, on account of the dullness of the market," &c.   Here, then, was a practical ratification of the contract, by recognizing its validity and conforming to its requirements for more than eighteen months.   And under and in conformity to the stipulations of the same contract, as we have already noticed, the plaintiffs took and held possession of the factory, and of the machinery and other personal property therein, including the property in question, without objection from the corporation, and with its tacit if not express assent.   It is clear therefore, that, as between the plaintiffs and the corporation, both parties would be held bound by the stipulations of the instruments under which they had so long acted, and that their respective rights and interests in the property in question must be determined by the provisions of those instruments.   And the defendant's title to the property can be no better than that of the corporation under which he claimed.

But the defendant claims, that, upon the true construction of the contract, the plaintiffs acquired no title to the property, but took and held it only as the agents of the corporation—to run the mills and carry on the business at the risk, and on account of, the corporation—and that so the property remained, in contemplation of law, in the possession of the corporation, unchanged, and subject to attachment at the suit of the creditors of the corporation, notwithstanding the pretended sur-

render of the possession of said property on the 11th of November, 1856.

It is however obvious that the contract was intended by the parties to secure to the plaintiffs the loan of forty-five thousand dollars made, and the further advancements to be made to, and liabilities incurred for, the corporation by the plaintiffs, and that one of the leading objects of the plaintiffs in taking possession of said property was to perfect their security and render it available for the payment of their claim. The instrument begins with an acknowledgment of the loan, and a statement of the consideration and inducement on account of which such loan was made. It counts upon the agreement of the corporation to consign its manufactured goods to the plaintiffs to be sold on commission, and the plaintiffs' undertaking to make further advancements to the corporation on the credit of such consignments. And the corporation undertakes to stock and run its mills within sixty days from the date of the contract, and to keep the same so stocked and running to their full and fair capacity, unavoidable casualties excepted, during the continuance of the agreement, and until said loan should be paid in full, and to consign to the plaintiffs all goods then in the hands of the corporation, and all goods thereafter to be manufactured at said mills, to be sold by the plaintiffs on commission. And the plaintiffs agree to make further advancements on the goods consigned, by accepting the drafts of the corporation at the end of every month, to the amount of one half of the net proceeds of the previous monthly sales, after deducting all advancements, interest and other charges agreed thereon—the other half of such net proceeds to be retained by the plaintiffs, to constitute a sinking fund, toward the payment of the principal of the forty-five thousand dollars loaned. The contract then provides that the corporation may put an end to it at any time, by giving the plaintiffs sixty days notice of its desire to do so, and paying up to the plaintiffs all debts and demands outstanding or due to them from said corporation under the agreement, then due or subsequently maturing; and that if the corporation shall fail to run said mills up to

their full and fair capacity as aforesaid, or omit to pay and satisfy the debts and demands due to the plaintiffs under said agreement, or make or suffer any other breach of any of its promises or agreements contained in said contract, then the plaintiffs may immediately enter and take possession of said mills, and all machinery, goods, stock, supplies and fixtures therein, and all the water power, buildings, lands and all their appurtenances, &c., and stock and run said mills for account and risk of said corporation, charging additional commissions therefor, or may suffer said mills to remain unemployed in their possession, or sell the same, and all the machinery and other fixtures therein, at the election of the plaintiffs, and out of said sales retain the amount due to them, whether payable then or afterwards; and that if the net proceeds of such sales shall be insufficient to pay all the plaintiffs' claims against the corporation, the balance shall be paid by the corporation on demand. The contract also refers in express terms to the mortgage, and states that it was given as security for the payment of the loan and the performance of the contract by the corporation, and is to be taken as part of said contract.

From this examination of the provisions of the instrument under which the plaintiffs took and held possession of the property, it is clear that their possession was coupled with an interest, of which they could not be deprived, either by the corporation or any other person, but on the terms expressed in the contract—the payment of their just claims upon the property so held for their security.

Again, it is contended by the defendant's counsel, that the attempted transfer of the property to the plaintiffs, was, as against the creditors of the corporation, fraudulent and void, because the possession did not accompany and follow the transfer.

Whether the possession was changed or not was a question of fact, which it is not the province of this court to decide. In the case of *Peck* v. *Whiting*, 21 Conn , 207, to which we were referred by the counsel, the goods were attached while in the actual possession of one of the assignors

and original owners.   No change of possession was claimed
to have been made.   In the language of Judge Hinman,
who delivered the opinion of the court, "the case turned
upon the question whether there was any legal reason for
the possession being retained by one of the assignors after the
assignment."   No such question appears to have been made
in this case.

The facts found by the court below—to wit, that the same
kind of business was carried on at the factory after the transfer
as before—that the same book-keeper and workmen were
employed, and the books kept in the same office—and that
the agent of the corporation continued after, as before the
transfer, to be occasionally in said office—although proper
for the consideration of the superior court, that it might de-
duce from them the proper inferences and conclusion, are
quite insufficient to enable this court to decide that such a
change as the law required had not been made.   And espe-
cially can we not so decide, in view of the other facts found
by the superior court, and stated upon the record in the same
connection, but tending to a different result.

In regard to the machinery, the defendant claims that the
plaintiffs acquired no title to it under their mortgage, because
it was not particularly described in said mortgage.   There
can be no doubt but that a mortgage of movable machinery
left in possession of the mortgagor, is constructively fraudu-
lent and void as against attaching creditors of such mortga-
gor, unless all of the statute requisites are complied with ;
one of which requisites is, that the mortgage shall contain a
particular description of such machinery, which this mort-
gage does not.   But neither the statute, nor the common law,
requires such particular description of machinery mortgaged
with the mill in which it is situated, and used, and actually
delivered with the mill into the possession of, and held by,
the mortgagee.   The want of it indeed, might perhaps afford
some evidence of fraud, but would probably fall short of
making even a *prima facie* case of it.

It is contended that the plaintiffs are not entitled to judg-
ment, because they gave no evidence of the state of their

accounts with the corporation at the time of the attachment, and no proof that their claims against the corporation, for the security of which they held the property, had not been satisfied and extinguished. No claim was made upon the trial, that the original transaction between the plaintiffs and the corporation was fraudulent in fact, or that the loan of forty-five thousand dollars was not, in good faith, made as stated in said mortgage. And the superior court has found that the plaintiffs took possession under the contract, for the purpose of carrying on the business thereafter according to the provisions of such contract. Thus the existence of the plaintiffs' debt, and of their right to take possession under the contract, was recognized by the parties, and upon the rightful acquisition of possession the plaintiffs became special owners of the goods ; and their title is presumed to continue until it is shown to have become extinct. If the accounts between the plaintiffs and the corporation could have been investigated and ascertained in this suit, to which the corporation was not a party, certainly they could not without great inconvenience. But, waiving that consideration, it is enough for our purpose that it was not incumbent on the plaintiffs to prove that their debts and claims had not been satisfied, or their title not otherwise extinguished, and no evidence upon the subject was offered by the defendant.

Upon the whole, then, we think the plaintiffs are entitled to recover the value of the cloths, as found by the superior court, with interest thereon from the 22d of November, 1856, and also the damages assessed by that court on account of the attachment of the machinery. And we advise the superior court to render judgment accordingly.

In this opinion the other judges concurred.

Judgment for plaintiffs advised.