THE STATE OF NEBRASKA, EX REL. DAKOTA COUNTY, v. S. J. ALEXANDER ET AL.

1. **Bonds: REGISTRATION.** In registering and certifying bonds issued under the act, "To authorize the issue of county bonds in certain cases," approved Feb. 19, 1877, the auditor and secretary of state have no right to review the action of their predecessors upon the original bonds.

2. ———: **VOTE OF PEOPLE.** In the issue of bonds under this act no vote of the people is required.

ORIGINAL application for mandamus to compel respondents, Alexander, the Secretary of State, and Wallichs, Auditor, to register certain bonds of Dakota county.

*Isaac Powers, Jr.,* and *E. Wakeley* for relator.

*C. J. Dilworth, Attorney-General,* for respondents.

LAKE, CH. J.

In the answer of the respondents to the alternative writ, but two reasons are given for the refusal to comply with its command to register and certify the bonds in question. *First.* That the original issue, which these bonds are designed to replace, was in excess of the amount which the

county was authorized to vote.  *Second.*  That the proposed issue has not been submitted to the voters, and is largely in excess of ten per cent of the assessed valuation of the taxable property of said county.

The question now presented is whether these reasons are sufficient to justify the defendants in their refusal to perform the required acts, it being conceded that they accord with the facts of the case.

The act under which the new bonds were executed is as follows:

" Section 1.  That any county, precinct, or city in the state of Nebraska, which has heretofore voted and issued bonds to aid in the construction of any railroad or other work of internal improvement, and which bonds, or any part thereof, still remain unpaid, and remain and are a legal liability against such county, and bearing interest at ten per cent per annum, is hereby authorized to issue coupon bonds at a rate ·of interest not exceeding eight per cent per annum, to be substituted in place of and exchanged for such bonds heretofore issued, whenever such county, precinct, or city, can effect such substitution and exchange, which substitution and exchange shall be dollar for dollar.

" Section 2.   The new bond so issued shall have recited thereon the object of its issue, the whole of the act under which the issue is made, stating the issue to be in pursuance thereof, and shall also state the number, date, and amount of the bond or bonds for which it is substituted, and such new bond shall not be delivered until the surrender of the bond or bonds so designated.

" Section 3.   The new bonds so issued shall not require a vote of the people to authorize such issue, and they shall be paid, and the levy be made, and the tax collected for their payment, in accordance with the laws now governing the said bonds heretofore issued."  Session laws, 1877, page 224.   Comp. Statutes, 325.

It will be noticed that by the first clause of the last sec-

tion of this act, a vote of the people upon the question of the issue of bonds under it is in express terms dispensed with. The propriety of replacing old bonds by new ones bearing a lower rate of interest is intrusted to the wisdom and discretion of the board of county commissioners, who it was doubtless presumed would so act as to subserve the best interests of the tax-payers.

The other question raised by the answer—that of the excess of each of these issues over the limit fixed by law—although rather more difficult, may, we think, be readily and satisfactorily answered.

The theory of the respondents is, that they are authorized and required to now pass upon the legality of the old bonds in performing their duties as to the new. If this were so, their action in the premises would be entirely justifiable. But, as we view the matter, their only duty respecting the former issue is to determine whether they are in fact internal improvement bonds, and bear evidence of having been lawfully issued. It is conceded that these bonds were issued to aid in the construction of a railroad —a work of internal improvement—and were registered and certified to as the law required. It is only by reviewing the action of former officers, by which the bonds are shown to have been properly issued, that they can now say they were unauthorized. This, we think, they have no right to do. As to them, the questions confided to the judgment of and decided by their predecessors are *res judicata*, and not to be opened. Finding the old bonds thus authenticated, which they concede they do, the only additional inquiry respecting them, which they may enter upon, is to satisfy themselves by proper evidence that the new bonds conform to the formal requirements of the act authorizing such re-issue. This done, all that remains for them is the ministerial duty of registration and indorsement, as directed by the alternative writ.

Inasmuch as the answer does not question the correct-

ness of the relation respecting the formal requisites of the new bonds, and thus concedes that they meet all of the statutory conditions, it was plainly the duty of the respondents to register and certify them, as directed by the alternative writ. There is no principle that we are aware of which will permit the respondents to overturn the action of their predecessors in registering and certifying to the legality of bonds, and a peremptory writ is awarded.

WRIT AWARDED.

MAXWELL, J., dissenting.

I do not dissent from the statement of the law in the syllabus of this case, but in my view the question at issue is entirely different from that stated therein. It appears from the pleadings that in the winter of 1875–6, and since our present constitution took effect, the county commissioners of Dakota county submitted to the electors of that county a proposition to issue county bonds to the Covington, Columbus & Black Hills railroad company, in the amount of $95,000; being fifteen per cent of the assessed valuation of the county. This proposition was submitted at one election, and received more than two-thirds of all the votes cast, and was declared carried, and the bonds were thereafter issued and placed in the hands of a trustee, and have been delivered to the railroad company or its assigns.

The election for these bonds was held under the provisions of section 2, article 12, of the constitution, which reads as follows: "No city, county, town, precinct, municipality, or other subdivision of the state, shall ever make donations to any railroad or other works of internal improvements, unless a proposition so to do shall have been first submitted to the qualified electors thereof, at an election by authority of law. *Provided*, that such donations of a county, with the donations of such subdivisions, in the

aggregate, shall not exceed ten per cent of the assessed val-uation of such property. *Provided further*, that any city or county may, by a two-thirds vote, increase such indebt-edness five per cent, in addition to such ten per cent, and no bonds or evidences of indebtedness so issued shall be valid unless the same shall have endorsed thereon a certifi-cate signed by the secretary and auditor of state, showing that the same is issued pursuant to law."

There is no statute in this state authorizing a county to issue its bonds in excess of ten per cent of the assessed val-uation, and the constitutional provision above quoted does not confer the right to vote bonds, but merely places re-strictions upon the power of the legislature, prohibiting it from ever authorizing the issue of such bonds in excess of fifteen per cent. The question here presented was before the court in the case of *Reineman v. C., C. & B. H. R. R. Co.*, 7 Neb., 312, the opinion being written by the present chief justice, who, after copying the section above quoted, said: "It will not be claimed that, in the absence of any law, either statutory or constitutional, the electors of a county or municipality could impose an indebtedness of this sort that would be binding upon the inhabitants thereof. Very clearly they could not. Neither will it be denied, we think, that in the absence of all constitutional restric-tion, the legislature could, by suitable enactment, author-ize such aid in any amount which the people might see fit to vote. Indeed, until the adoption of our present consti-tution, this whole matter of municipal aid to works of in-ternal improvement was within the sole control of the state legislature, and subject to no restraint other than such as that body in its wisdom saw fit to impose. This being so, the section of the constitution above quoted must be considered as restrictive only upon the exercise of legisla-tive discretion in the authorization of county and munici-pal indebtedness, to aid in the construction of railroads and other works of internal improvement. It fixes the boun-

dary beyond which the legislature cannot go, but within which its authority is still supreme. The constitution does not, of its own force and independently of the legislature, assume to authorize the people to vote such aid, but, on the contrary, the necessity of legislative permission and direction is expressly recognized."

Again, on page 313, he said: "We conclude, therefore, that until the legislature shall by suitable act change the existing statutory law so as to authorize it, there is no warrant for creating a county indebtedness in aid of internal improvements exceeding in the aggregate ten per cent of the assessed value of the taxable property within the county furnishing such aid. And further, that by the amendment of February 17th, 1875, such aid must have been authorized by at least two-thirds of all the votes cast on the proposition to extend such aid." It was held that as the proposition was submitted as an entirety, and exceeded the statutory limit, the election was simply "a void act, conferring no authority whatever upon the board of county commissioners to issue the bonds of the county in any amount whatever."

The correctness of that decision has never, so far as I am aware, been questioned, nor can it be successfully. A county has no inherent right to issue commercial paper. It is a mere governing agency of the state, with certain powers distinctly specified in the statute. Now suppose such organization, without legislative authority, should issue its bonds to a railroad company to the amount of fifty per cent of its assessed valuation, would such bonds possess any validity? There would be a lack of power on the part of those executing the bonds that would render them invalid in whatever hands they might be found. The reason is, the county commissioners in issuing bonds act under a special power, and if they proceed without authority, their acts are simply void. Nor can it make any difference whether the bonds issued without authority of law

amount to fifteen or fifty per cent of the assessed valuation. In either case, being in excess of the powers conferred, they are nullities. In the case under consideration, the $95,000 issued by Dakota county in 1876, being five per cent in excess of the limit fixed by law, in the opinion of the writer are null and void. Yet it is proposed to issue funding bonds to the amount of $144,000 to replace such bonds, the rate of interest to be diminished to six per cent. And the mandamus applied for in this case is to compel the secretary of state and auditor to endorse on these bonds that they are issued pursuant to law. The object of the constitutional provision, so far as the writer is aware, was to prevent unprincipled persons from going into the unsettled counties of the state, and issuing fraudulent obligations in the names of such counties, and selling the same, and thus not only defraud the purchasers, but bring reproach upon the good name of the state. But the respondents are not judicial officers, nor is their certificate a guaranty on the part of such officers or of the state that the instruments are valid. Such officers may make a mistake as to the law, and so long as they act in good faith they are not personally liable for the same. Thus, the former auditor and secretary of state, evidently supposing that the constitution alone conferred authority to issue bonds to the extent of fifteen per cent of the assessed valuation, certified that the $95,000 bonds in question were issued pursuant to law. But this added nothing to their validity, and that question can be determined alone by the court. Where, however, these officers object to certifying certain bonds, upon the ground that they are illegal as in this case, the court, in order to compel them to act, must declare that the proposed bonds are legal. This court must in effect hold that the $95,000 of bonds issued in 1876 without authority of law, were and are legal obligations of Dakota county. Such a decision breaks down all the barriers erected for the protection of tax-payers, and is fraught with evils the full import of

which may not now be apparent. There are other questions in the case which cannot be considered without extending this opinion to too great length. The writ should be denied.