THE STATE OF NEBRASKA, EX REL. WILLIAM LEESE,
ATTORNEY GENERAL, V. G. W. WILKINSON, TREA-
SURER OF DAKOTA COUNTY.

**County Bonds:** REFUNDING BONDS: MANDAMUS: ESTOPPEL.
On the 1st day of January, 1876, the county of D., in pursu-
ance of a vote of the people so directing, issued and delivered
to the Covington, Columbus, and Black Hills Railroad Com-
pany its negotiable ten per cent coupon bonds for the sum of
$95,000, that being more than ten per cent of the assessed valu-
ation of the county. These bonds were duly registered and
certified by the county clerk of D. county, and by the secretary
and auditor of state. Afterwards the county refused to pay the
interest, and an action was instituted against it in the circuit
court of the United States for the purpose of collecting the in-
terest due on the coupons. The defense of the illegality of the
bonds, owing to the excessive issue, was interposed, but the
bonds were held valid in the hands of a *bona fide* purchaser for
value, and judgment was rendered against the county for
$14,692.91. No proceedings in error or by appeal were then
taken for the purpose of obtaining a review of that judgment.
The county board then agreed with the holders of the bonds to
execute to them twenty-year six per cent refunding bonds to
be substituted for the bonds of 1876, under the provisions of
the act of February 28, 1883. The refunding bonds were exe-
cuted and registered and certified by the county clerk, but the
secretary and auditor of state refused to register them or to
certify that they were lawfully issued, alleging that such was
not the fact. The county then applied to the supreme court for
a peremptory writ of mandamus to compel action by the state
officers, and judgment was obtained in favor of the county,
awarding the writ and compelling the certification and registry.
After they were certified and registered by the state auditor,
the county exchanged them for the original bonds of 1876, and
the interest accrued thereon, and destroyed the original bonds.
In an action to enforce the payment of the interest accrued on
the refunding bonds, it was *Held*, That the county was estopped
to deny their validity in the hands of a *bona fide* holder for
value.

ORIGINAL application for mandamus.

*William Leese, Attorney General,* and *J. M. Woolworth,* for relator.

*A. J. Poppleton* and *John M. Thurston,* for respondent.

REESE, J.

This is an original application for a writ of mandamus to the respondent, the county treasurer of Dakota county, requiring him to pay the interest on certain coupon bonds of Dakota county, held by the permanent school fund of the state, out of funds in his hands collected by taxation for that purpose. The county board of Dakota county having directed him to withhold payment, he has refused to make the application of the money to the purpose for which it was collected. In reality the county is the interested party, and denies the legality of the bonds.

The history of this alleged indebtedness of Dakota county, as shown by the records of the county before us, and of this court, dates from the first day of January, 1876, when the county issued its bonds bearing interest at ten per cent per annum, to the amount of $95,000, to the Covington, Columbus, and Black Hills Railroad Company to assist in the construction of its railroad. At that time the total valuation of the county was $637,656, the issue of bonds being in excess of the ten per cent then allowed by law, although issued in pursuance of a vote of the people at an election held for the purpose, and at which more than two-thirds of the voters voting were in favor of the issue. The bonds were duly registered and certified by the county clerk of Dakota county, and by the auditor and secretary of state, in accordance with the provisions of law then in force. (See chap. 9, Comp. Stats.)

In the case of *Reineman v. C., C. & B. H. R. R. Co.,* 7 Neb., 310, it was held that such an election conferred no power on the county board to issue the bonds, and they

were restrained from doing so. The question of the valid-ity of the bonds in the hands of an innocent holder for value was not before the court in that case, and was not decided; and in our view of this case we do not think it a material question here, notwithstanding the state is an innocent holder for value.

Some time after the issuance of the bonds referred to, the county, through its officers, concluded they were void, and refused payment of the interest. One Henry H. Glidden, being the owner of a large part of the bonds, and upon which the interest was unpaid, brought suit in the circuit court of the United States for the district of Nebraska, for the unpaid interest on his bonds, and at the May term of said court, 1882, recovered a judgment for $14,692.91. On the trial of that cause it was insisted that the bonds were void, but the court held otherwise and rendered the judgment. In June, 1882, the question of a compromise of the bonded indebtedness of the county and a refunding thereof at a lower rate of interest was suggested, and on the 29th of that month the county board took action thereon, as shown by the following entries upon their records, they being in regular session at the time :

"The matter of the compromise and adjustment of the bonded indebtedness of Dakota county on bonds issued January 1st, 1876, to the Covington, Columbus and Black Hills Railroad Company by said county, by the issuance of six per cent bonds in exchange for and substitution of said indebtedness, was considered and discussed by the board, and on motion the board adjourned to July 5, 1882, to further consider the same."

On the 5th day of July the board met pursuant to adjournment, and again considered the matter, as shown by their records, and from which we quote, as follows :

"And now at this time, to-wit, July 5th, 1882, the matter of compromising and refunding the bonds issued by Dakota county to aid in the construction of the Covington, Colum-

bus, and Black Hills Railroad Company came on for con-
sideration. And after due deliberation, and being advised
in the premises, it is hereby ordered by the board that the
proposition heretofore made by the holders of said bonds
to surrender said bonds and coupons, and have the same
canceled and to take in lieu thereof new coupon bonds to
run twenty years from the first day of July, 1882, paya-
ble at the option of the county ten years after this date,
and to draw interest at the rate of six per cent per annum,
interest payable semi-annually, be and the same is hereby
accepted. And the said bond-holders are requested to des-
ignate some suitable person as their agent, with authority
to surrender said bonds, and to receive and receipt for such
new bonds, and to do such other acts as may be necessary
in making such compromise. The bond-holders to have
the blanks prepared for such new bonds at their own ex-
pense."

The board adjourned from time to time until the 14th
day of August of the same year, when the following pro-
ceedings were had as shown by the record. We quote:

"Now at this time, August, 14th, 1882, the board of
county commissioners met pursuant to adjournment  *   *
*   *   *   *   to proceed to the matter of issuing bonds of
said county to take up and refund the ten per cent bonds
and coupons heretofore issued by said county to aid the
Covington, Columbus, and Black Hills Railroad Company
on January 1st, 1876. And the said former issue of bonds
still being a just debt and legal liability against the county
of Dakota, and it being for the best interest of the county
to take up the same and issue new six per cent bonds there ·
for; the said county commissioners do hereby order and
authorize the execution and issuance of bonds bearing in-
terest at six per cent per annum from July 1st, 1882, pay-
able semi-annually on the first days of January and July
in each year, and running twenty years from and after July
1st, 1882, and principal payable at the option of the county

after ten years from date—principal and interest payable at Farmers Loan and Trust Company in the city of New York, and such issue shall be to the amount of one hundred and forty-four thousand dollars, being the amount of said former issue of bonds with unpaid coupons and interest thereon to July 1st, 1882. And the chairman of the board of county commissioners of said county is hereby authorized and directed to sign and execute said bonds for and on behalf of the county, and the clerk of the county shall duly attest the same and affix the seal of the county thereto, and the coupons thereto attached shall be signed by the clerk of said county, and after the certification and registration thereof, as by law required, the same shall be surrendered respectively to the parties entitled thereto on the presentation of the former issue of bonds and coupons for which said respective new bonds shall be issued in substitution of or exchange for—said substitution and exchange to be dollar for dollar."

The new bonds were prepared and signed by the chairman of the board, attested, certified, and registered by the county clerk, and presented to the auditor and secretary of state for registration and certification. The auditor and secretary refused to certify and register the bonds as requested, giving as their reasons therefor a doubt as to their legality, owing to the excessive issue of the bonds of 1876. The county of Dakota then instituted a mandamus proceeding in the supreme court against the state officers named, to compel them to register and certify the bonds as having been "regularly and legally issued" and properly registered. Upon a hearing of the cause a peremptory writ of mandamus was issued as prayed, and the auditor and secretary of state were compelled to register and certify the bonds. See *The State of Nebraska, ex rel. Dakota county, v. S. J. Alexander et al.*, 14 Neb., 280.

In that case the county was represented by able counsel who urged upon the court the propositions that the bonds

of 1876 were a legal liability against the county, and that the compromise affected was one greatly to the county's interest.

On the former proposition they said—quoting from their brief—

"It has been held by this court, *Reineman v. C., C. & B. H. R. R. Co.*, 7 Neb., 310, that the issue of bonds in excess of the ten per cent of the valuation is illegal, and the United States circuit court for this district has held that such issue is illegal and that such 'illegality is available to defeat the bonds in the hands of the original donee or holder, with notice of the excess.' It is conceded that this position is correct. But the question here is not whether it was legal to issue the bonds, but whether they constitute a 'legal liabilty' against the county. The distinction is obvious. The consideration of a negotiable note or bond may be illegal, while in the hands of a *bona fide* holder it may be a legal and valid obligation enforceable by suit.  *  *  *  The act of 1877 was passed for a practical purpose, which clearly appears on its face. That purpose was to enable counties without a vote of the electors to exchange for bonds bearing ten per cent interest new bonds bearing a lower rate, and by that much lessen the burden of the county. It seems an obvious proposition, that if it be uniformly held by the courts of competent jurisdiction in which all the suits on the bonds may be, and if necessary will surely be, brought, that they are a 'legal liability,' then for all practical purposes, and within the intent of the law, they are so. The qualification that they can be enforced only by *bona fide* holders, furnishes no practical protection to the county. Negotiable in form, transferable by mere delivery, not maturing for many years to come, the purchaser not even put on inquiry by the presence of unpaid matured coupons, and, with the presumption of the law that the holder paid value and took them without notice of excess of issue or other ille-

gality or failure of consideration, no successful defense has yet been made, or in all probability ever will be made against the bonds in question.

"We submit to this court that in the face of the multi-tude of adverse decisions by that final tribunal, repeated as often as cases reach it, and controlling those of inferior federal courts where no review can be had, it is hopeless for this county to fight against fate. It is the part of wis-dom in municipal as well as private affairs to submit to the inevitable and make the best of it. Counsel submit-ting this paper have persistently and unavailingly urged in the litigation already had whatever argument and reason they were master of against the conclusions reached. They believe their client acts wisely in making 'a virtue of neces-sity' and the best terms of compromise that can be secured."

Upon the latter proposition they say, "The advantages to the county in making the compromise, assuming that the bonds and coupons of 1876 will be valid, are obvious.

"First, the arrears of interest, in round numbers about $50,000, will be funded in six per cent thirty-year bonds, instead of being put into judgment as fast as the machinery of federal courts will permit, and collected at once by peremptory and grievous tax levies and assessments.

"Second, the annual interest on the $95,000 of ten per cent bonds is $9,500. At six per cent it will be $4,800. Annual difference, $4,700. Aggregate difference for four-teen years before the bonds of 1876 will mature, $65,800. (The figures here given are quoted from the brief as there found, without any reference to their correctness).

"Third, it gives the taxpayers ample time at a low rate of interest to meet the obligations, thus throwing a part of the burden upon the people and the taxpayers of the future, for whose benefit the debt was incurred, if, in fact, the ob-ject for which it was created was a public benefit."

Finally, it is submitted by the county that the case "is clearly within the statute which allows the commissioners,

in their discretion, to exchange and substitute the proposed bonds for the former issue, which practically and effectively constitute a ' legal obligation against the county.' "

As we have said, upon these records, arguments, and the application of the county, the peremptory writ of mandamus was awarded, and thereby the state officers were compelled to certify—in the language of the statute—" under their seal of office, * * * upon such bonds, the fact that they have been regularly and legally issued," and the bonds thus certified, negotiable in form, were thrown upon the markets of the world and purchased by those who relied upon the certificates and adjudication.

We have copied at some length from the records and representations of the county in procuring the adjudication referred to, not for the purpose of showing that the original bonds were legal when issued, nor even a "legal liability" against the county, nor have we thus referred to the judgment of the supreme court and the registration and certification of the bonds in question here for the purpose of showing that by either the bonds were made valid—for we do not hold that the registry and certification of an invalid bond makes it valid—but for the better consideration of the contention of the relator that by these several acts and the results which followed, the county is now estopped to deny the validity of the bonds in the hands of an innocent holder for value.

There is, without doubt, a wide distinction between the holdings of the supreme court of the United States and of the supreme courts of many of the states upon the question of the rights of *bona fide* holders of negotiable municipal bonds, as against defenses made by the municipalities in actions to recover on such bonds. But this distinction is not so well marked when the controversy arises before the issue of the bonds, between the taxpayers on the one hand and the officers of the municipality or the donee on the other. In the latter case the doctrine of estoppel has

no place. Neither do the rights of innocent holders for value intervene, and therefore the rule may be said to be universal that in cases where the prevention of the exercise of the power to execute and deliver such bonds is the relief sought, a strict compliance with the provisions of law will be required or the delivery of the bonds will be enjoined. 1 Dillon Municipal Corporations, sec. 164.

It is well settled that a municipal corporation may be estopped by its own acts, if within the powers conferred by law, the same as an individual. *Kneeland v. Gilman*, 24 Wis., 39. *Houfe v. Fulton*, 34 Id., 608. *Leavenworth v. Laing*, 6 Kas., 274. *Argenti v. San Francisco*, 16 Cal., 255. *Hooker v. Bank*, 30 N. Y., 83. *Howe v. Keeler*, 27 Conn., 538. *Hart v. Stone*, 30 Id., 94.

It is provided by statute that any county may issue its bonds for the purpose of refunding its bonded indebtedness—Act 1883, Laws 1883, 194—and that the act shall include all bonds determined to be valid and binding, in the hands of *bona fide* holders, by any state or federal court of competent jurisdiction within the state, etc., and that it shall be the duty of the auditor of state to register the substituted bonds, and the secretary and auditor of state to certify them, etc. By the law governing the certification of bonds, it is made the duty of the auditor to first satisfy himself that the bonds have been legally issued, etc., and to certify the fact. Chap. 9, Comp. Stats. The state officers refused to make the certificate to the refunding bonds for the reason that they believed them invalid. The county insisted that they were valid, procured a judgment of the supreme court that it was the duty of the officers to certify as requested, and in obedience to that judgment the bonds were registered and certified and allowed to go upon the market. Furthermore, it was insisted by the county that the officers should certify the bonds because they were compromise bonds issued in settlement of bonds which had been held and determined, by

a federal court of competent jurisdiction, to " be valid and and binding in the hands of *bona fide* holders thereof in an action thereon," and therefore constituted a legal liability against the county.

In *The County of Jasper v. Ballou*, 103 U. S., 745, where bonds were issued under a statute authorizing it to refund bonds previously issued, and which previous bonds were issued by virtue of a vote of the people at an illegal election—being called by the board of supervisors instead of by the county court, as the law provided—and where the funding bonds were taken and held by the holder of the original bonds in exchange therefor, it was held that the county was estopped from setting up the alleged invalidity of the original bonds as a defense to the action on the refunding bonds.     See also *Board of Liquidation, etc., v. Railroad Co.*, 109 U. S., 221.     *New Albany v. Burke*, 11 Wall., 96.   The law requiring it, the funding bonds were issued in pursuance of a vote of the people.     In this state such vote is not necessary.   The same power is lodged in the county board.

The general power of a county to compromise pending litigation or certain classes of disputed claims is conceded by respondent, but it is contended that no power exists to legalize void corporate actions by way of compromise.   Or, in other words, it is insisted that the county of Dakota had no authority to compromise this claim, because it was void from the beginning.   The federal court had held the original bonds valid in the hands of a *bona fide* holder for value. The county acquiesced in that judgment, and declined to contest the case further, and compromised the whole indebtedness.   Thus, by its own action, it brought itself within the letter of the act of 1883 (sec. 2), which authorized it, in that contingency, to issue the refunding bonds. It is true that after it had effected the compromise it sought a review of the judgment of the federal court by a proceeding in error in the supreme court of the United

States, but upon it being made to appear to that court that the bonds in question here had been issued and delivered and the old bonds destroyed, the writ of error was dismissed; the court holding that it was a valid compromise, settlement, and extinguishment of the cause of action. *Dakota County v. Glidden,* 113 U. S., 222. But this effort to secure a review of the adverse decision of the circuit court was not made until after the county had procured the judgment in the case of *The State, ex rel. Dakota County, v. Alexander* (14 Neb., 280), nor until after the original bonds had been surrendered and destroyed, and the funding bonds issued and accepted in their stead.

The funding bonds may be, and probably are, legal, as the result of a compromise of the demand growing out of the bonds of 1876, but we do not decide that question. We hold that the county is now estopped to deny their legality in the hands of a *bona fide* purchaser for value, and that the relator is entitled to a writ of mandamus to compel the county treasurer to pay the interest out of the funds in his hands collected for that purpose.

WRIT ALLOWED.

THE other judges concur.